# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### WESTERN DIVISION
#### No. 5:24-CV-00209

| | | |
|---|---|---|
| B.G.H., a Minor, by and through his Parents as Natural Guardians and/or Next Friends Natori Tia Harrell and Ryan Harrell, NATORI TIA HARRELL, Individually, and RYAN HARRELL, Individually, | ) ) ) ) ) | **COMPLAINT** |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| UNITED STATES OF AMERICA | ) ) | |
| Defendant. | ) ) ) | |

COME NOW Plaintiffs B.G.H., a Minor, by and through his Parents as Natural Guardians and/or Next Friends Natori Tia Harrell and Ryan Harrell, NATORI TIA HARRELL, Individually, and RYAN HARRELL, Individually, (collectively "Plaintiffs"), and through their undersigned counsel file this Complaint against the UNITED STATES OF AMERICA ("Defendant"), and allege and aver as follows:

## I.
## PARTIES, JURISDICTION AND VENUE

1.1     This is a medical malpractice case brought under the Federal Tort Claims Act (FTCA) for severe, permanent injuries and damages arising out of negligent acts or omissions of employees, agents, apparent agents, servants and/or representatives of the United States of America (hereinafter sometimes "United States") while acting within the course and scope of their employment, agency, apparent agency, servitude, or representative capacity, under circumstances where the United States, if a private person, would be liable to the Plaintiffs under the laws of the State of North Carolina where the acts and/or omissions occurred. This Court has original subject matter jurisdiction

pursuant to 28 U.S.C. §1346(b).

1.2 At all times relevant to these matters, the employees, agents, apparent agents, servants or representatives of the United States were subject to the United States' right to control, including substantial supervision and direction over their day-to-day activities.

1.3 Plaintiffs Ryan Harrell and Natori Tia Harrell are the biological parents of B.G.H., and thus the natural guardians of B.G.H. pursuant to N.C. Gen. Stat.§ 35A-1201; they bring this suit for the benefit of B.G.H. as his parents and natural guardian representatives under Fed R. Civ. P. 17(c)(1) to the extent permitted by law, and/or as his next friends pursuant to Fed R. Civ. P. 17(c)(2) if not fully permitted to do so, for all of B.G.H.'s claims herein, as well as in their own capacities individually for all their claims herein.

1.4 Plaintiffs Natori Tia Harrell and B.G.H. reside in Iredell County, North Carolina. Plaintiff Ryan Harrell resides in Davidson County, North Carolina. Both parents share equally in the custody of B.G.H.

1.5 At all times relevant to this Complaint, Defendant, the United States of America, was the employer or principle of employee/agent health care providers who administered care and treatment to, Natori Tia Harrell while she was in labor and at delivery with B.G.H., and to B.G.H., on April 13th-14th, 2020, at Womack Army Medical Center (hereinafter sometimes as "WAMC"), located in Cumberland County and/or other counties encompassing Fort Bragg (now Fort Liberty), North Carolina.

1.6 Defendant United States of America will be served with process in accordance with Rule 4(i) of the Federal Rules of Civil Procedure, including by serving a copy of the Summons and Complaint on The Attorney General of the United States of America, Merrick B. Garland, by certified mail, return receipt requested, at the U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530, and by serving a copy of the Summons and Complaint on Michael F.

Easley, Jr., Acting United States Attorney for the Eastern District of North Carolina, as well as a copy of the Summons and Complaint on the Civil-Process Clerk at such U.S. Attorney's Office, both via certified mail, return receipt requested, at 150 Fayetteville Street, Suite 2100, Raleigh, North Carolina 27601. As a courtesy, the Secretary of the Army, Christine E. Wormuth, will be served in like fashion at 101 Army Pentagon, Washington, DC 20310.

1.7     Venue is proper in the United States District Court for the Eastern District of North Carolina pursuant to 28 U.S.C. §1402(b) and §1391(a)(1) and (b)(2) as the United States is a Defendant and all or a substantial part of the cause of action, events and omissions accrued in this District.

1.8     The Western Division is the appropriate and convenient venue for this case.

## II.
## <u>LIABILITY OF THE UNITED STATES OF AMERICA</u>

2.1     This case is commenced and prosecuted against the United States of America pursuant to and in compliance with Title 28 U.S.C. §§2671-2680, *et seq.,* commonly referred to as the "Federal Tort Claims Act" (FTCA).  Liability of the United States is predicated specifically on Title 28 U.S.C. §§1346(b)(1) and 2674 because the personal injuries and resulting damages of which complaint is made, were proximately caused by the negligence, wrongful acts or omissions of employees/agents of the United States at WAMC in/at Fort Bragg (now Fort Liberty), while acting within the scope of their office or employment/agency, under circumstances where the United States, if it were a private person, would be liable to the Plaintiffs in the same manner and to the same extent as a private individual under the laws of the State of North Carolina.

2.2     The United States Army is an agency of the United States of America. The United States of America, Defendant, through its agency, the United States Army, at all times material hereto, owned, operated and controlled the health care facility known as Womack Army Medical

Center, and though its agency, the United States Army, staffed the health care facility with their agents, servants, and/or employees.

2.3     At all material times in April of 2014, Womack Army Medical Center also had and did provide various medical residency programs, teaching and training for employee/agent physicians seeking specialization training.  The types  of such residencies included three or four year programs in Obstetrics and Gynecology, or in Family Medicine.  The residents who provided care to Natori Tia Harrell and B.G.H. at WAMC on April 13-14, 2020 were CPT Marion M. Ward, M.D., who was in the first year of her medical residency program, *i.e.* post-graduate year (PGY-1), believed to be in Obstetrics and Gynecology, and CPT Leighann A. Black, M.D., who was in the second year of her medical residency (PGY-2), also believed to be in Obstetrics and Gynecology.

2.4     The foregoing residents were supervised on April 13-14, 2020 by a nurse midwife, MAJ Nicole A. Durbin, CNM, and/or a family medicine physician, Christina M. Kelly, M.D.  No obstetrician was ever provided by WAMC to care for Natori Tia Harrell or B.G.H. during the labor or delivery.

2.5     At all times material to their negligence on April 13-14, 2020 which proximately caused Plaintiffs' injuries, the employees, agents, and/or apparent agents of the Defendant at WAMC, including but not limited to medical, midwife and nursing providers, and specifically CPT Marion M. Ward, M.D., CPT Leighann A. Black, M.D., MAJ Nicole A. Durbin, CNM, Marceal S. Johnson, CNM, and Christina M. Kelly, M.D., had a professional relationship (doctor-patient, nurse practitioner-patient and/or nurse-patient) relationship with Natori Tia Harrell and B.G.H., and were acting within the course and scope of their employment or agency relationship with and for the Defendant/WAMC.

<strong>III.</strong><br><strong><u>JURISDICTIONAL PREREQUISITES</u></strong>

3.1     In compliance with 28 U.S.C. § 2675, each of the three Plaintiffs timely and properly filed their administrative claims based on the facts alleged herein with the appropriate federal agency–The Department of the Army–for damages arising out of the personal injuries sustained by B.G.H. a Minor, and his parents Natori Tia Harrell and Ryan Harrell, due to the negligence of the United States' agents, servants, and employees, acting and practicing in the course and scope of their employment at Womack Army Medical Center, in Fort Bragg, North Carolina on April 13-14, 2020. These claims were received by the Department of the Army on February 12, 2021, and are attached (with appropriate redactions as to the Minor) as Exhibit 1 to this Complaint.

3.2     Greater than six months has passed since the filing of these claims.  During and since this time there have been extensive evaluations and discussions of these claims and B.G.H.'s injuries/condition by and with the Defendant's/WAMC's representatives, in an attempt to resolve these claims.  All applicable statutes of limitations have been tolled since Plaintiffs' filings of their administrative claims.

3.3     The United States Army has failed to resolve any of the Plaintiffs' claims, however, seemingly unaware of the four-year North Carolina Statute of Repose in N.C. Gen. Stat. § 1-15(c) that the Defendant would no doubt later raise to urge dismissal of the parents' individual claims were this Complaint not to be brought on or before April 14, 2024.

3.4     The delay of the United States Army in resolving these claims has therefore necessitated the filing of this Complaint, despite ongoing settlement or negotiation overtures with the United States Army.  Accordingly, the Claimants have exhausted their administrative remedies and deem the claims denied.  Plaintiffs have thus complied with all jurisdictional prerequisites prior to commencement of this litigation and prior to the expiration of any statutes of limitations or repose.

## IV.
## OTHER CONDITIONS PRECEDENT

4.1     To the extent that N.C. Gen. Stat.§ 1A-1, Rule 9(j) requires Plaintiffs to prove their case prior to factual discovery, or denies medical malpractice plaintiffs their rights of due process of, or equal protection under the law, or to open courts, or that it violates the separation of powers clause, and/or confers an exclusive emolument on or for health care providers, in violation of the United States and North Carolina constitutions, Plaintiffs would urge that Rule 9(j) is unconstitutional and/or inapplicable to an FTCA claim in that it violates the Seventh and Fourteenth Amendments of the United States Constitution, and Article I, Sections 6, 18, 19, 25 and 32, and Article IV, sections 1 and 13, of the North Carolina Constitution.

4.2     Without waiving the objections above, counsel for Plaintiffs provides the following statement to comply with the requirements of N.C. Gen. Stat.§ 1A-1, Rule 9(j) and the North Carolina Rule of Civil Procedure for pleading the special matter of medical malpractice in a Complaint: The medical care rendered by the employees, agents, and apparent agents of the Defendant and all medical records pertaining to the alleged negligence that are available to the Plaintiffs after reasonable inquiry have been reviewed before the filing of this Complaint by a person who is reasonably expected to qualify as an expert witness under Rule 702 of the Rules of Evidence and who is willing to testify that the medical care provided by the employees, agents, and apparent agents of the Defendant did not comply with the applicable standard of care.

4.3     More specifically, and again without waiving the objections above, prior to the filing of this Complaint the medical, nurse midwifery, and nursing care, and all medical records pertaining to the alleged negligence of the Defendants' employees, agents or apparent agents, including but not limited to CPT Marion M. Ward, M.D., CPT Leighann A. Black, M.D., MAJ Nicole A. Durbin, CNM, Marceal S. Johnson, CNM, and Christina M. Kelly, M.D., that are available to the Plaintiffs,

including after multiple inquiries and requests to WAMC, have been reviewed by the following five experts, each of whom are qualified in their respective subspecialties or fields and are reasonably expected to qualify as expert witnesses under Rule 702 of the Rules of Evidence, and all of whom are willing to testify that the medical, midwifery, and/or nursing care (as reflected by their specialties below) provided by the employees, agents, and apparent agents of the Defendant did not comply with the applicable standards of care:

> (a) <u>Obstetrician and Maternal-Fetal Medicine Medical Doctor</u>: who also has trained and supervised obstetrical residents in or through a recognized residency program;

> (b) <u>Obstetrician Medical Doctor</u>: who also has trained and supervised various types of medical residents in or through recognized residency programs, as well as nurse midwives;

> (c) <u>Family Medicine Medical Doctor</u>: who also has trained and supervised family medicine residents in or through a recognized residency program;

> (d) <u>Certified Nurse Midwife (CNM)</u>: and,

> (e) <u>Obstetrical Nurse (R.N).</u>

4.4 Additionally and again without waiving the above objections, should the Court later determine that Plaintiffs' 9(j) expert(s) does/do not meet the requirements of Rule 702(b) or Rule 702(c), Plaintiffs will seek to have that/those person(s) qualified as expert witness(es) by motion under Rule 702(e) of the Rules of Evidence, and Plaintiffs hereby move the Court, pursuant to Rule 9(i)(2,) to so qualify that/those person(s).

4.5 Plaintiffs have thus complied with the foregoing, as well as all other conditions precedent to the filing of this Complaint.

<h1 style="text-align:center">V.</h1>
<h2 style="text-align:center">FACTUAL BACKGROUND AND ALLEGATIONS</h2>

5.1     Plaintiffs Natori Tia Harrell and her husband, Ryan, were filled with joy and anticipation as they eagerly awaited the arrival of their firstborn child in April 2020.  Throughout her pregnancy, Mrs. Harrell had received prenatal care from Defendant's healthcare providers at Womack Army Medical Center (WAMC). Her pregnancy progressed without any significant complications, giving the couple every reason to believe they would welcome a healthy baby into their lives.

5.2     On the afternoon of April 13, 2020, Natori Tia Harrell, at 39.2 weeks gestation, arrived at WAMC to see if her water (membranes) had broken.  Upon application of electronic fetal monitoring (EFM) at approximately 14:55, it was evident that she was experiencing contractions. Although irregular, some contractions were indicative of excessive uterine activity (EUA), as evidenced by prolonged contractions and/or contraction couplings.

5.3     Vital signs and physical examination shortly thereafter revealed that Mrs. Harrell had mildly elevated blood pressure, consistent with gestational hypertension (GHTN).  Additionally, she was diagnosed with a yeast infection and tested positive for Group B Streptococcus (GBS).

5.4     Due to the presence of GHTN, the decision was made to admit Mrs. Harrell and induce labor (IOL).  The induction process began with administering a cervical ripening agent (Cervidil), followed by Pitocin augmentation.  Appropriate GBS prophylaxis with penicillin was planned and successfully administered during labor to prevent transmission to the neonate.  Notably, no ultrasound was performed upon admission or during this pregnancy since a basic fetal anatomy scan in the first trimester of September 2019.

5.5     At the time of the IOL decision on April 13th, Natori Tia Harrell's cervix was completely closed (unripe), she was not in active labor, and her membranes were intact.  Her Bishop

score, an indication of cervical readiness for induction, was 0, reflecting the least favorable odds for a successful IOL and subsequent vaginal delivery.

5.6     The aforementioned factors in a primigravida (who has not delivered vaginally before and therefore has an untested pelvis) indicated a high likelihood of a prolonged IOL with an increased risk for complications, including severe complications necessitating a Cesarean section (C-section).  Therefore, WAMC and its obstetrical caregivers knew or should have known the critical importance of assigning experienced and qualified providers to manage Mrs. Harrell's labor and delivery.  This included the presence of a qualified medical doctor/obstetrician to timely and properly determine the need for, and be readily available to perform, an expedited and proper operative vaginal delivery, or C-section should the need arise.

5.7     Regrettably, the caregivers assigned by WAMC to manage Mrs. Harrell's labor and delivery on April 13-14, 2020, were ill-equipped and/or ill-suited for the task. The primary physicians managing the labor and delivery were first and second-year residents, Dr. Ward and Dr. Black, neither of whom, upon information and belief, were qualified or capable to properly determine when a C-section was necessary, nor qualified or privileged to perform the procedure— or at least not to perform it without direct supervision by a qualified attending physician/obstetrician. Upon information and belief, their supervisors, midwife Major Durbin and/or Dr. Ward, also lacked the necessary capabilities, privileges, and/or qualifications.

5.8     MAJ Nicole A. Durbin, CNM, was assigned as the supervising staff attending for Dr. Ward before or beginning at the time of Dr. Ward's examination and evaluation of Natori Tia Harrell at WAMC around 16:08 on April 13, 2020.

5.9     At approximately 18:42 on April 13, 2020, Dr. Ward initiated induction with Cervidil (a cervical ripening agent) while Mrs. Harrell's cervix remained closed (0 cm dilated) and 20%

effaced (thinned or stretched), with the fetus at a -4 station—meaning the level of the presenting part of the baby's head in relation to the mother's pelvis.

5.10    Cervidil, containing dinoprostone, is known to potentially cause or exacerbate EUA, a fact that should have been well-known to Natori Tia Harrell's caregivers at WAMC on April 13-14, 2020.

5.11    EFM following Cervidil administration revealed periods of EUA in Mrs. Harrell, such as uterine hypertonicity/hypercontractility, including with episodes of prolonged contractions and/or coupling throughout the night into April 14th, before Pitocin augmentation.

5.12    Prolonged EUA can lead to a lack of adequate blood oxygenation of fetal body tissues (hypoxia) and can deplete fetal reserves, diminishing the baby's natural compensatory mechanisms to tolerate transient hypoxic conditions during contractions. This can result in catastrophic consequences if the baby is subsequently subjected to worsening or persistent and acute hypoxic/ischemic conditions once decompensated, potentially causing brain injury. These principles should have been well-known to Mrs. Harrell's caregivers at WAMC on April 13-14, 2020.

5.13    On April 14, 2020, at approximately 07:41, Dr. Ward performed a sterile vaginal examination (SVE), revealing Natori's cervix to be 2 cm dilated, 70% effaced, with the fetus at a -2 station, indicating the early phase of the first stage of labor.  Another SVE by Darian Bennett, RN, at around 10:22, showed Mrs. Harrell to be 4.5 cm dilated, 80% effaced, with the fetus at a -2 station, confirming the early labor stage.

5.14    Dr. Ward performed another SVE at approximately 15:28, revealing Natori Tia Harrell to be 5 cm dilated, 100% effaced, with the fetus at a 0 station.  Despite a decrease in the number of contractions, some remained prolonged, indicative of ongoing EUA. Nonetheless, Dr. Ward decided to initiate Pitocin augmentation.

5.15    Pitocin, a synthetic version of the naturally occurring hormone oxytocin, is known to promote uterine contractility and labor.  It is well-established and should have been known to Mrs. Harrell's care givers at WAMC on April 13-14, 2020, that Pitocin can cause or worsen EUA.

5.16    Pitocin was initiated on April 14th at 2 mU/min around 15:52, and increased to 4 mU/min at about 16:32. EUA in the form of prolonged contractions persisted, and B.G.H. began to show signs of decompensation by 16:54, with a late fetal heart rate (FHR) deceleration observed on the EFM between 16:54-56. Additional late FHR decelerations were noted by Rumita Nixon, RN, between 17:09 and 17:13, for which only partial intrauterine resuscitation measures were implemented.

5.17    Late FHR decelerations during labor are well-recognized signs of fetal distress or intolerance to labor, a fact that should have been known to Mrs. Harrell's healthcare providers at WAMC on April 14, 2020.

5.18    Late decelerations continued and became severe between 17:16 and 17:24.  At 17:17, Natori Tia Harrell's uterine tone was documented as having increased from moderate to strong, with no apparent rest between contractions. During this time, CNM Johnson, Dr. Ward, and Dr. Black were present at the bedside and decided to stop Pitocin.

5.19    At 17:23, an SVE revealed Mrs. Harrell to be almost fully dilated at 10 cm, with only an anterior lip of the cervix remaining, 100% effaced, and the fetus at a +1 station, indicating proximity to the second stage of labor, which is when the cervix is fully dilated and pushing can begin.  No umbilical cord was felt during the SVE.

5.20    At 17:24, with the FHR severely depressed, Dr. Ward applied a fetal scalp electrode (FSE).  The purpose of an FSE is to directly measure the actual beat-to-beat electrical signals of the fetal heart, rather than utilizing an external transducer (as part of the EFM) to do so, so that fetal

distress can be more readily ascertained or ruled out.

5.21    The results of the FSE were alarming, revealing ongoing severe fetal distress with FHR of 60 beats-per-minute (BPM).  A drug to prevent or slow contractions (terbutaline) was ordered by Dr. Black/Dr. Ward, and given at 17:26, in an effort to halt the ongoing EUA (uterine hypertonicity/tachysystole/tetany).

5.22    Due to the severe fetal distress exhibited by B.G.H., an emergency "CODE MAMA" was called at 17:27.

5.23    Instead of immediately calling for a stat C-section as well, the WAMC caregivers, Dr. Ward, Dr. Black, and CNM Johnson, decided to attempt an operative vaginal delivery via vacuum extraction near or during the second stage of labor.  It is believed that Dr. Christina M. Kelly, upon her arrival, agreed to this course of action.  Severe FHR decelerations and fetal distress persisted during preparations for the attempted vacuum extraction.

5.24    Vacuum extractors, when used appropriately based on fetal station, cephalic position, and other factors, may facilitate or expedite vaginal delivery. The device is applied by correctly placing the vacuum cup on the fetal head and creating the necessary negative pressure through a hand-held pump. The operator then pulls the device in a proper manner, coinciding with uterine contractions and maternal pushing efforts, to deliver the baby's head and body.  The vacuum pressure is released between contractions, and repressurized again prior to each use, *i.e.* with each contraction and pull.  Use of a vacuum extractor is considered an operative vaginal delivery.

5.25    Vacuum extraction carries potential risks for the fetus, including scalp trauma, subgaleal hematoma, potential brain bleeding/injury, and the possibility of a "pop-off" of the cup from the fetal head, thereby failing to achieve further descent.  These risks should have been known to Dr. Black, Dr. Ward, CNM Johnson, and Dr. Kelly at all material times.

5.26 Given these risks, it is well-established and should have been recognized by the care providers on April 14, 2020, that the operator must have a low threshold for abandoning vacuum extraction when unsuccessful; and, in the face of fetal distress he or she must then immediately resort to either a Cesarean section or to a more stable and controlled device, such as forceps, depending on the circumstances. This is especially true in a mother with a previously untested pelvis.

5.27 Multiple vacuum extraction attempts were made by Dr. Ward or Dr. Black, and by CNM Johnson between approximately 17:32-17:38 and 17:56-17:57. During this time, at least two separate vacuum devices were used, numerous pulls were attempted, and at least four cup pop-offs occurred.

5.28 The first vacuum, a Kiwi, was initially placed and used by Dr. Ward/Black when the fetus was still at a +1 station, resulting in a pop-off. Despite blood impacting the vacuum seal from an oversaturated sponge inside the cup, the same vacuum was reapplied by one of the same residents or CNM Johnson, and another pull was made, to no avail.

5.29 Around 17:45, CNM Johnson took over the vacuum extractor operation. She noted that the fetal head vertex was very snug, barely allowing room for her hand. CNM Johnson's vacuum attempts were also unsuccessful, with at least two more pop-offs. An episiotomy was performed around 17:53, but blood and amniotic fluid saturation of the vacuum sponge, along with the baby's abundant hair, continued to result in a weak seal.

5.30 CNM Johnson then requested another provider to perform a Ritgen maneuver involving upward pressure and flexion of the fetal head. A Ritgen maneuver is a procedure to extract the fetal head over the perineum--that involves a provider using one hand to pull or lift up the fetal chin, keeping upward pressure and the fetal head flexed, from between the maternal anus and coccyx while pressing against the back of the fetal head (occiput) with the other hand to control the speed

of delivery.  However, the second provider was unable to palpate the fetal chin while CNM Johnson reattempted pulling, resulting in a third pop-off of the vacuum cup.

5.31    The Kiwi vacuum was replaced with another Kiwi vacuum device either before or after the second or third pop-off, due to the problems maintaining a seal and vacuum pressure. During these times the EFM continued to demonstrate severe uterine hypertonicity/tetany and severe FHR decelerations until around 17:50-17:51.

5.32    CNM Johnson reapplied a/the Kiwi vacuum after the third pop-off when the fetal head was crowning.  She attempted another Ritgen maneuver, this time by herself, but was unable to palpate the fetal chin. Another attempt at vacuum extraction was made by CNM Johnson, resulting in a fourth pop-off.

5.33    Vacuum extraction attempts were not abandoned until around 17:56-57, with delivery still not achieved.   Although uterine hypertonicity had diminished by this time, late FHR decelerations persisted, albeit much less severe than during vacuum use.

5.34    With the baby's head still crowning, Natori Harrell was encouraged to push. Approximately ten minutes later, B.G.H. was delivered by Dr. Ward.  Upon delivery, the umbilical cord was found wrapped around B.G.H.'s shoulders, a condition known as a "bandolier" cord.  The infant was severely depressed and compromised, with terminal meconium present.

5.35    While often benign, a bandolier cord can result in interruption or impairment of blood flow to the fetal tissues (ischemia) and hypoxia during labor due to external compression of the umbilical cord by the maternal pelvis as the baby descends or is pulled through the birth canal.  This condition can be visualized on third-trimester ultrasound, particularly at term, but went unrecognized as no ultrasound was performed on Mrs. Harrell at WAMC in the third trimester, prior to IOL on April 13, 2020, or before labor on April 14, 2020.

5.36    At birth, B.G.H. had no cry or muscle tone, a heart rate less than 60 BPM, and he required artificial resuscitation, including positive pressure ventilation and increasing oxygen support.  His initial Apgar score at 1 minute was 2.

5.37    Ongoing assessments revealed B.G.H. to be of normal length, weight, head circumference, and appearance, with no visible deformity (dysmorphia).  However, he was in respiratory failure and had no reflexes.  Given the severity of his condition, B.G.H. was intubated at 4 minutes of life.  His 5-minute and 10-minute Apgar scores remained significantly depressed at 5 and 6, respectively.

5.38    While the WAMC neonatal team was resuscitating and providing medications for B.G.H., Natori Tia Harrell was receiving surgical repair of 4th degree perineal lacerations and vaginal lacerations she had received during this traumatic delivery.

5.39    Dr. Danielle Bird, the neonatologist/pediatrician, soon determined through screening that B.G.H. was positive for hypoxic-ischemic encephalopathy (HIE), a condition resulting from hypoxia and/or ischemia causing altered brain function.  HIE in a newborn is considered to be caused by limited oxygen and blood flow near the time of birth.

5.40    The screening evidence of HIE at WAMC included late FHR decelerations before birth, umbilical cord arterial blood analysis revealing profound metabolic acidosis (pH 6.9, base deficit 21), lethargy, decreased spontaneous movement, hypotonia, weak or incomplete reflexes, constricted pupils, bradycardia, and periodic breathing. Based on the positive screening, Dr. Bird contacted the University of North Carolina (UNC) Chapel Hill to arrange for B.G.H.'s transport for hypothermic treatment, the standard of care for neonatal HIE.

5.41    B.G.H. was transported in critical condition via helicopter from WAMC to UNC Chapel Hill on April 14, 2020, at 23:00, arriving at 23:35.  At UNC, he received therapeutic

hypothermia for the appropriate 72-hour cooling period for his moderate encephalopathy. During this time and in the ensuing days, he was treated with various medications and tested for conditions other than HIE, such as sepsis, newborn metabolic disorders, genetic disorders, and congenital heart disorders. All of these conditions were either negative or ruled out, while the diagnosis of HIE remained.

5.42 By April 15, 2020, while still undergoing cooling, B.G.H. began to manifest subclinical seizures. Seizures or seizure activity is a clinical manifestation of HIE typically seen within the first 24 or 48 hours following an intrapartum hypoxic-ischemic insult near the time of birth that results in brain injury. B.G.H. was treated extensively with antiseizure medication over the next seven days to prevent further brain injury.

5.43 An MRI of B.G.H.'s brain with contrast, performed on April 20, 2020, revealed brain injury in the form of signal abnormalities in the bilateral lentiform nuclei and ventrolateral thalami, symmetric restricted diffusion in the bilateral ventrolateral thalami, and a small subgaleal hematoma in the parieto-occipital region. While the hematoma was likely related to vacuum extraction attempts, the deep gray matter injury in the thalami and nearby basal ganglia (lentiform nuclei) was attributed to hypoxia-ischemia by the UNC physicians, corroborating the HIE diagnosis.

5.44 B.G.H. remained hospitalized at UNC Chapel Hill for 27 days until he was stable for discharge on May 11, 2020. His primary active and final diagnoses at discharge were "HIE (hypoxic-ischemic encephalopathy)" and consequent newborn feeding problems commonly seen in HIE brain-injured children.

5.45 Since discharge, B.G.H. continues to suffer from catastrophic and irreversible neurologic injury that has profoundly impacted all aspects of his life and that of his parents. He experiences severe physical impairment, disfigurement, developmental delays, and severe mental

impairment due to his HIE brain injuries. These injuries and conditions will, with reasonable medical certainty/probability, be life-long for B.G.H.

5.46 The natural progression of children who are severely brain-injured from HIE is the development of a condition called cerebral palsy (CP). CP is a disorder that impacts an individual's motor control, movement, balance, and posture related to brain dysfunction. On November 12, 2020, B.G.H. was diagnosed with CP by Dr. Steven P. Tau, a pediatric neurologist and Clinical Assistant Professor of Neurology at UNC School of Medicine. The "cerebral" part of B.G.H.'s palsy is brain damage from hypoxic-ischemic injury that occurred during his mother's labor at WAMC on April 14, 2020, near the time of birth.

**VI.**
**CAUSE(S) OF ACTION**
**COUNT I: NEGLIGENCE, CAUSATION AND LIABILITY**

6.1. Plaintiffs hereby repeat and incorporate all prior paragraphs and subparts therein, including all factual allegations, as if fully stated herein.

6.2. The medical, midwifery, and nursing personnel of Womack Army Medical Center, Fort Bragg, had a duty to care for and treat Natori Tia Harrell and B.G.H. on April 13-14, 2020 in accordance with recognized standards and the applicable standards of care required of such types of health care providers in the same or similar circumstances pursuant to North Carolina law.

6.3. The care and treatment rendered to Natori Tia Harrell and B.G.H. by WAMC medical, midwifery and/or nursing personnel breached the acceptable standards of care and was negligent.

6.4. More specifically, Plaintiffs would show that the Defendant failed to use ordinary care and was negligent on April 13-14, 2020, including by and through its medical, midwifery and nursing employees/agents/apparent agents, and/or is vicariously liable under the doctrine(s) of *respondeat superior* and/or agency for such negligent conduct, in one or more of the following particulars set

out below:

(a) The Defendant and/or CPT Marion M. Ward, M.D., CPT Leighann A. Black, M.D., MAJ Nicole A. Durbin, CNM., and/or Christina M. Kelly, M.D. failed to timely require, order and have performed an ultrasound of Mrs. Harrell prior to IOL or her labor onset, which with reasonable medical probability/certainty would likely have demonstrated the fetus' bandolier umbilical cord, thereby avoiding a labor and/or attempted vacuum extraction;

(b) The Defendant and/or CPT Marion M. Ward, M.D., CPT Leighann A. Black, M.D., MAJ Nicole A. Durbin, CNM., Christina M. Kelly, M.D., and/or its nursing staff permitted or ordered Pitocin augmentation, including in increasing dosage, when it was inappropriate to do so, including in view of EUA during the preceding time prior to and during attempted cervical ripening;

(c) The Defendant's employees/agents/apparent agents CPT Marion M. Ward, M.D., CPT Leighann A. Black, M.D., MAJ Nicole A. Durbin, CNM., Christina M. Kelly, M.D., and/or its nursing staff failed recognize, and/or to timely recognize, the presence of EUA/uterine hypertonicity on EFM;

(d) The Defendant's employees/agents/apparent agents CPT Marion M. Ward, M.D., CPT Leighann A. Black, M.D., MAJ Nicole A. Durbin, CNM., Christina M. Kelly, M.D., and/or its nursing staff failed to timely recognize the ongoing risk or danger of depleting fetal reserves due to the exhaustion of fetal compensatory mechanisms in response to EUA/uterine hypertonicity;

(e) The Defendant's employees/agents/apparent agents CPT Marion M. Ward, M.D., CPT Leighann A. Black, M.D., MAJ Nicole A. Durbin, CNM., Christina M. Kelly,

M.D., and/or its nursing staff failed to timely request/perform adjustment of the EFM (external tocodyanometer/transducer), and/or to apply an intrauterine pressure catheter (IUPC);

(f) The Defendant's employees/agents/apparent agents CPT Marion M. Ward, M.D., CPT Leighann A. Black, M.D., MAJ Nicole A. Durbin, CNM., Christina M. Kelly, M.D., and/or its nursing staff failed to timely discontinue Pitocin, and/or to timely provide all appropriate intrauterine resuscitation measures for the fetus;

(g) The Defendant failed to timely provide an obstetrician and/or adequately qualified supervisory personnel for its medical residents, CPT Marion M. Ward, M.D. and/or CPT Leighann A. Black, M.D., and/or for its midwives MAJ Nicole A. Durbin, CNM and/or Marceal S. Johnson, CNM;

(h) The Defendant's employees/agents/apparent agents CPT Marion M. Ward, M.D., CPT Leighann A. Black, M.D., MAJ Nicole A. Durbin, CNM, Christina M. Kelly, M.D., and/or its nursing staff mismanaged the labor, failed to timely seek appropriate obstetrical consultation, and/or inappropriately delayed delivery;

(i) The Defendant failed to have qualified personnel, equipment, facilities, supplies, and/or equipment necessary to provide/perform C-sections, including on a stat basis;

(j) The Defendant's employees/agents/apparent agents CPT Marion M. Ward, M.D., CPT Leighann A. Black, M.D., MAJ Nicole A. Durbin, CNM, and/or Christina M. Kelly, M.D., failed to timely offer, order and perform a C-section, and/or to have a C-section performed, and/or failed to timely deliver the baby;

(k) The Defendant's employees/agents/apparent agents CPT Marion M. Ward, M.D., CPT Leighann A. Black, M.D., Marceal S. Johnson, CNM, and/or Christina M. Kelly,

M.D., decided on plan/course of operative vaginal delivery, *i.e.* attempted vacuum extraction, at a time when the same was inappropriate given the events and circumstances leading up to Mrs. Harrell entering into the second stage of labor;

(l) The Defendant failed to timely provide qualified personnel at delivery who were sufficiently trained in, and had the appropriate technical skills, the necessary aspects/types of operative vaginal delivery;

(m) The Defendant's employees/agents/apparent agents CPT Marion M. Ward, M.D., CPT Leighann A. Black, M.D., Marceal S. Johnson, CNM, and/or Christina M. Kelly, M.D., mishandled, mismanaged, and/or failed to appropriately supervise the attempted operative vaginal delivery, including but not limited to, by:

(1) failing to have performed episiotomy timely;

(2) attempting vacuum extraction when the mother was not fully complete and/or when the fetus was not in/at an appropriate position, presentation, and/or station;

(3) failing to utilize an appropriate Kiwi vacuum device under the circumstances, and/or providing ill-advised, improper, and/or injudicious use of the same;

(4) failing to timely abandon attempted vacuum extraction; and/or

(5) failing to timely convert to a C-section, and/or to forceps; and,

(n) The Defendant's employee/agent/apparent agent Christina M. Kelly, M.D., failed to timely intervene during the operative vaginal delivery in order to effectively accomplish the same in a timely and appropriate manner.

6.5    Each and all of the foregoing acts and/or inactions, of omission and/or commission, either singularly or in any combination, amounted to negligence and was/were a proximate cause of the HIE, brain injuries, and cerebral palsy suffered by B.G.H., as well as all of the Plaintiffs' injuries

and damages as set out herein.

6.6     Accordingly, Defendant is directly and/or vicariously liable to the extent and circumstances it would be were it a private person under North Carolina law for Defendant's own negligence, and/or the negligence of its employees, agents, and/or apparent agents acting in the course and scope of their employment, agency relationship, and/or apparent agency relationship, which was/were a proximate cause of all of Plaintiffs' injuries and damages as set out below.

## VII.
## DAMAGES

7.1     Plaintiffs hereby repeat and incorporate all prior paragraphs and subparts therein, including all factual allegations, negligence, and causation particulars, as if fully stated herein.

7.2     As a direct and proximate result of the negligence of the Defendant and/or its employees, agents, and/or apparent agents above, B.G.H. has sustained damages, but are not limited to, the following:

(a) Past and future physical pain, suffering, and mental anguish;

(b) Future medical, health, therapy, rehabilitation, and attendant care/costs after the age of 18 years, including as set out below;

(c) Future loss of earnings and earning capacity after the age of 18 years;

(d) Past and future physical disfigurement and impairment, including mental impairment (*e.g.* cognitive, vision, hearing, language and/or speech);

(e) Past and future loss of enjoyment of life and embarrassment;

(f) Future out of pocket expenses after the age of 18 years; and,

(g) all other compensatory and pecuniary damages as permitted under North Carolina law.

7.3     As might be expected in a child such as B.G.H., his past and future damages are and

will be, with reasonable medical certainty/probability, staggering, and of enormous economic cost, including for all the life-long personal care, attendance, rehabilitation, therapies, mobility and adaptive living/adjunct devices, living requirements, loss of future earnings, and medical, nursing, and ancillary health care and treatments that he will require, among other matters. Plaintiff B.G.H., a Minor, by and through his Parents as Natural Guardians and/or as Next Friends Natori Tia Harrell and Ryan Harrell, seeks the recovery of all such economic damages above as appropriate, including as appropriate after the age of majority.

7.4    The harm that B.G.H. has suffered and likely will continue to suffer from a non-economic standpoint are immeasurable, but far exceed any statutory limits that could be applicable or imposed under North Carolina law.  Plaintiff B.G.H., a Minor, by and through his Parents as Natural Guardians and/or as Next Friends Natori Tia Harrell and Ryan Harrell, seeks the recovery of all such non-economic damages above as appropriate, with reasonable probability/certainty, including as appropriate after the age of majority.

7.5    Plaintiff, B.G.H., a Minor, by and through his Parents as Natural Guardians and/or as Next Friends Natori Tia Harrell and Ryan Harrell, seeks the recovery of all such economic and non-economic damages in an amount up to that as stated in his claim (SF-95) timely submitted to the Defendant, as contained in Exhibit 1 to this Complaint (and incorporated herein for a specific amount if necessary).

7.6     As a direct and proximate result of the negligence of the Defendant and/or its employees, agents, and/or apparent agents above, Plaintiffs Natori Tia Harrell, Individually, and Ryan Harrell, Individually, have, with reasonable medical probability/certainty, each sustained damages, individually, including for the economic damages sustained by B.G.H. until he reaches the age of majority.  These damages include, but are not limited to, the following:

(a) Medical, nursing, therapy, attendant care, and rehabilitation expenses for B.G.H. sustained in the past and that in reasonable probability/certainty will be sustained in the future until B.G.H. reaches the age of 18 years;

(b) Special educational expenses for B.G.H. sustained in the past and that in reasonable probability will be sustained in the future until B.G.H. reaches the age of 18 years;

(c) Special adaptive living expenses for B.G.H. sustained in the past and that in reasonable probability will be sustained in the future until B.G.H. reaches the age of 18 years;

(d) The reasonable value of attendant care provided by the parents to B.G.H. to the age of 18;

(e) Loss of household services of B.G.H until he reaches the age of 18 years;

(f) Out of pocket expenses until B.G.H. reaches the age of 18 years;

(g) Physical pain and mental anguish of Mrs. Harrell due to her injuries from the traumatic birth;

(h) Loss of consortium between Mr. and Mrs. Harrell due to Mrs. Harrell's injuries from the traumatic birth, as well as mental anguish, suffering, loss of consortium due to disruption of the marital relations of Mr. and Mrs. Harrell from B.G.H's injuries if permissible; and,

(i) All other compensatory and pecuniary damages as permitted under North Carolina law.

7.7     Plaintiff Natori Tia Harrell, Individually, and Plaintiff Ryan Harrell, Individually, each seek the recovery of all such economic and non-economic damages in an amount up to that as stated in each of their claims (SF-95) timely submitted to the Defendant, as contained in Exhibit 1

to this Complaint (and incorporated herein for specific amounts if necessary).

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, PREMISES CONSIDERED, Plaintiffs request that the Defendant be cited to

appear and answer herein, and that upon final trial, they each have:

1. Judgment in their favor and against the Defendant, United States of America;

2. All past and future compensatory, economic, non-economic, and pecuniary damages as fully described in the Complaint above;

3. All elements of interest as appropriate, including but not limited to post-judgment interest in the maximum amount to the extent permitted by law;

4. Costs of court; and

5. Such other and further relief to which Plaintiffs may be justly entitled.

Respectfully submitted,

This the 8th day of April, 2024

By:*/s/ Mark D. Clore*

Mark D. Clore
Clore Law Group, LLC
78 Ashley Point Dr, Ste 200
Charleston, SC 29407
843-722-8070
Fax: 843-722-9881
mark@clorelaw.com
NC Bar. No. 33308
Local Civil Rule 83.1(d) Attorney for Plaintiffs

Michael Archuleta, J.D., M.D., M.B.A.*
Archuleta Law Firm
1100 Lakeway Dr, Ste 101
Lakeway, TX 78734
512-266-7676
marchuleta@govtclaim.com
TX Bar. No. 00783555
Attorney for Plaintiffs
* Notice of Special Appearance to follow